CASE 29.—ACTION BY J. P. TAYLOR AND OTHERS AGAINST THE UNION TRUST & SAVINGS COMPANY.—June 17, 1910.

## Union Trust & Savings Co. of Maysville v. Taylor, &c.—Taylor, &c. v. Deposit Bank of Pearce, Fant & Co., &c.

Appeals from Fleming Circuit Court.

C. D. NEWELL, Circuit Judge.

From a judgment granting insufficient relief, plaintiffs and defendants appeal.—Affirmed in part and reversed in part.

1. Assignments for Benefit of Creditors—Acts Constituting.—A real estate mortgage to secure a debt simultaneously created by the loan of money to the mortgagor, was executed in good faith, and not in contemplation of insolvency nor with a design to prefer a creditor. It was lodged for record, but not recorded. The mortgagor requested that it should not be recorded, and the mortgagee stated to the clerk that he must take his own course. Within 30 days the debt was paid

284        KENTUCKY REPORTS.        [Vol. 139.

U. T. & S. Co., M'ville v. Taylor.—Taylor v. Dep. Bk. Pearce, F. & Co.

by the mortgagor procuring money elsewhere and the mortgage by order of the mortgagee was surrendered. Held, that the mortgage was not within Ky. St. section 1910, making a mortgage by a 'debtor, in contemplation of insolvency, an assignment for the benefit of creditors, etc.

2.   Assignments for Benefit of Creditors—Constructive Assignment—Acts Constituting.—A chattel mortgage given to secure money simultaneously furnished by the mortgagee is not within Ky. St. section 1910, though not recorded within 30 days.

3.   Assignments for Benefit of Creditors—Constructive Assignment—Acts Constituting "Payment in Contemplation of Insolvency."—A payment by an insolvent debtor in the usual course of his business to maintain his credit, preserve his estate, and carry on his business, without any intent to prefer one creditor to another, is not a payment in contemplation of insolvency, and with a design to prefer a creditor within Ky. St. section 1910.

4.   Assignments for Benefit of Creditors—Constructive Assignment—Acts Constituting.—A devisee, given the option to purchase the interest of a codevisee for $8,000, exercised the option and paid the codevisee the money, borrowing from a bank $2,120 therefor. The codevisee, pursuant to an arrangement between the devisee and the bank, conveyed her interest to the bank to secure that sum and other sums that might be advanced by it to the devisee. Several years later the devisee paid the bank the $2,120 and interest, and $300 advanced by the bank. The devisee during the period of these transactions was heavily involved. Held, that the deed to the bank was not within Ky. St. section 1910, making a conveyance by a debtor in contemplation of insolvency and with the design to prefer a creditor, an assignment for the benefit of creditors; and the failure to record the deed within 30 days was immaterial, since the transaction between the bank and the devisee was merely a lending of money on security, and since there was no record title in the devisee, whose only right was the right to redeem.

5.   Assignments for Benefit of Creditors—Constructive Assignment—Acts Constituting.—A debtor borrowed $13,000 and executed a mortgage for $15,000 to secure that sum and $2,000 due the mortgagee. The mortgage was not recorded because the parties expected the execution of a larger mortgage to secure additional loans. The execution of the larger mortgage was delayed by the death of a creditor. There was nothing to show an intention of the debtor to prefer any

creditor, but only an effort of a struggling debtor to maintain his credit and preserve his estate. Held, that the transaction was not in contemplation of insolvency with a design to prefer a creditor within Ky. St. section 1910, and the mortgage was valid.

6. Assignments for Benefit of Creditors—Constructive Assignment—Acts Constituting—Presumptions.—Where an insolvent debtor makes a transfer to a creditor with knowledge that he is insolvent, the design to prefer such creditor within Ky. St. section 1910, is presumed, unless the attending circumstances show the contrary.

7. Assignments for Benefit of Creditors—Constructive Assignments—Acts Constituting.—The purpose of Ky. St. section 1910, making every transfer by a debtor in contemplation of insolvency and with a design to prefer a creditor an assignment for the benefit of creditors, etc., is to secure equality between creditors and when a preference is in fact given, the debtor is held to have intended it, and the act is within the statute.

8. Assignments for Benefit of Creditors—Constructive Assignments—Acts Constituting.—A debtor in fact insolvent, but believing himself solvent, executed a mortgage whereby he secured a bank company managed by a third person, who was a friend, and whereby he paid off creditors whom the third person had represented in lending their money. Practically all the property of the debtor was mortgaged and about half of his creditors were unprovided for. The mortgage included $13,000 which the mortgagee had previously furnished and which was secured by a valid prior mortgage. Held, that the mortgage and payments subsequently made thereunder, including the payment of a debt included in the prior mortgage, were within Ky. St. section 1910, making every transfer by a debtor in contemplation of insolvency with the design to prefer creditors, an assignment for the benefit of creditors, except as to the $13,000 secured by the prior mortgage, and as to that, it was valid.

9. Assignments for Benefit of Creditors—Constructive Assignments—Acts Constituting.—A payment by an insolvent debtor of a debt by borrowing money from a third person secured by notes which the debtor held, and a payment to a creditor by delivering to him a check which was paid after the debtor's death, are payments by an insolvent with a design to prefer a creditor within Ky. St. section 1910.

10. Assignments for Benefit of Creditors—Constructive Assignments—Acts Constituting.—The pledging by an insolvent of collateral notes to a bank to secure a debt created simultaneously is not a transfer by an insolvent with a design to prefer a creditor within Ky. St. section 1910, and the transaction is valid.

GARRETT S. WALL, WORTHINGTON & COCHRAN and others for appellants.

J. H. POWER, R. J. BABBITT, B. S. GRANNIS and others for appellees.

OPINION OF THE COURT BY JUDGE HOBSON.

R. T. Marshall died a resident of Fleming county on May 7, 1907, the owner of a considerable estate and owing many debts. This suit was brought on July 3, 1907, by J. P. Taylor and others as his creditors, attacking a number of transactions by him within six months before the petition was filed, under section 1910, Ky. St. (Russell's St. sec. 2104), on the ground that they were had in contemplation of insolvency and with the design to prefer one or more of his creditors to the exclusion of the others. On a final hearing of the case the circuit court entered a judgment in favor of the plaintiffs as to certain of the transactions, and dismissed their petition as to others. From this judgment the plaintiffs and the defendants have both appealed. The matters involved on the appeals will be disposed of separately.

1. In December, 1907, Marshall proposed to borrow $10,000 from the Deposit Bank of Pearce, Fant & Company. The bank finally agreed to lend him the money upon the execution of a mortgage on his land. He executed the mortgage and the money was paid him. The mortgage was then lodged for record with the clerk; the tax being paid. But Marshall request-

ed the clerk not to record it and he in fact did not record it. There is some conflict in the evidence as to what occurred when the mortgage was left with the clerk, but we think the weight of it shows that Marshall requested that the mortgage should not be recorded, and that the president of the bank when the clerk asked him about it, said that he must take his own course. The mortgage had not been recorded on January 5, 1907, when Marshall borrowed $10,000 from another source and paid the debt. The mortgage was then by order of the bank surrendered to Marshall, having not in the meantime been recorded. The statute is in these words: "Every sale, mortgage or assignment made by debtors, and every judgment suffered by any defendant, or any act or device done or resorted to by a debtor, in contemplation of insolvency and with the design to prefer one or more creditors to the exclusion, in whole or in part, of others, shall operate as an assignment and transfer of all the property and effects of such debtor, and shall inure to the benefit of all his creditors (except as herein provided) in proportion to the amount of their respective demands, including those which are future and contingent; but nothing in this article shall vitiate or affect any mortgage made in good faith to secure any debt or liability created simultaneously with such mortgage, if the same be lodged for record within thirty days after its execution." (Section 1910, Ky. St.) The original transaction was simply a lending of money. The mortgage was given in good faith to secure a debt created simultaneously with the mortgage. There was nothing in the transaction in contemplation of insolvency, or with the design to prefer one or more creditors of Marshall to

the exclusion of the others. Thirty days had not expired after the execution of the mortgage when the debt was paid, and so the bank had not lost any of its rights by the fact that the mortgage had not been recorded up to that time.

2. On January 11, 1907, Marshall borrowed of the Deposit Bank of Pearce, Fant & Company, $3,000 secured by a mortgage upon his cattle; the money being furnished simultaneously with the execution of the mortgage, but the mortgage was held unrecorded until May 8, 1907, the next day after Marshall's death. This mortgage was not recorded within 30 days, but as it was given to secure a debt created simultaneously with its execution, it does not fall within the statute. In Meier v. Flinsbach, 95 Ky. 145, 24 S. W. 236, 15 Ky. Law Rep. 485, the court construing the statute said: "After providing in the body of the section that every sale, mortgage, etc., made by a debtor in contemplation of insolvency and with the design to prefer one or more creditors to the exclusion of others, shall operate as an assignment, the section concludes with this proviso: 'But nothing in this article shall vitiate or affect any mortgage made in good faith to secure any debt or liability created simultaneously with such mortgage, if the same be lodged for record within thirty days after its execution.' (Gen. St. 1888, c. 44, art. 2, sec. 1.)  Now certainly it would seem self-evident that before trying to apply this proviso we should first find a case to which the body of the section can be applied. In order to hang a thief you must first catch him as 'catching comes before hanging.' In order to apply this proviso, you must first find a case in which an insolvent debtor, or one in contemplation of insolvency, has made a mortgage or sale, etc., with the design to prefer one creditor

to another." The mortgage cannot therefore be held
within the statute although not recorded within 30
days.

3. On January 27, 1907, Marshall paid to the State
National Bank $800, on an antecedent debt; on March
4, he paid to the Deposit Bank of Pearce, Fant &
Company $1,150, upon an antecedent debt, and on the
same day he paid to the State National Bank of Mays-
ville $1,000, on an antecedent debt; on March 25, 1907,
he paid to Nelson Fant $1,062, on an antecedent debt.
All these payments are attacked under the statute,
and may be disposed of together. Marshall owned
1,136 acres of land which he valued at $80,000; he had
visible personal property which he valued at $20,000;
he had $6,000 or $8,000 of notes. The land after his
death sold for $47,000; the personal property for
about $11,000. He handled a large amount of cattle
and was engaged in the export business. He raised
horses and cultivated large crops on his farm. In
carrying on his business he needed large sums of
money. He stood high and was regarded as a man
of high character and was very prompt in meeting
his obligations. By reason of his promptness and his
high character he seemed to have unlimited credit
among those who knew him. He was careful to pro-
tect his paper, and was always on hand when it fell
due to arrange matters. When people whom he owed
wanted money he made it a point to get it for them.
The payments above referred to were made
by him in the usual course of his business,
just as he had been making payments for
years. They were evidently made in good
faith and for the purpose of preserving his
credit and carrying on his business. He was then feed-
ing a large number of cattle which he wished to get

into the market.  A payment of money in the usual
course of business will not be regarded as a violation
of the statute, where it is done in good faith and with
no intent to prefer one creditor to another, but sim-
ply in honest effort by the debtor to meet his obliga-
tions.  Were the rule otherwise, many men who are
seriously involved and who by successful management
pay off their obligations and accumulate quite a for-
tune, would be obliged to suspend business and bring
ruin upon themselves.  It is true a payment of money
made with the intention to prefer one creditor to an-
other and in contemplation of insolvency is within the
statute.  But a payment of money in good faith by an
involved debtor to maintain his credit and preserve
his estate is not within the statute, where there is in
fact no intention to prefer, and the circumstances
show that a preference was not contemplated.

4. R. T. Marshall was a son of Charles Marshall.
Charles Marshall owned the land above referred to,
and devised it to his wife and three children.  One of
his daughters, Mrs. Taylor, was devised a certain
part of the land, and it was provided in the will that
R. T. Marshall should have the right to purchase her
interest for the sum of $8,000.  R. T. Marshall exer-
cised the option thus given him and purchased Mrs.
Taylor's interest for $8,000.  He paid Mrs. Taylor
all of the purchase money but $2,120, prior to Febru-
ary 16, 1901.  She then wanted the rest of her money.
Marshall not having the money to pay her, made an
arrangement with the Fleming County Farmers'
Bank by which it paid her the $2,120, and she ex-
ecuted a deed to the bank for her interest in the land,
it being agreed between Marshall and the bank that
the bank would not record the deed, and would hold it
as security for the money paid Mrs. Taylor, and for

anything that Marshall might owe the bank. Things
stood thus until March 25, 1907, when Marshall paid
the bank $3,192, about $300 of this being money he
owed the bank, and the remainder being the money
which the bank had advanced Mrs. Taylor with inter-
est. It is insisted that the deed held by the bank was,
in substance, only a mortgage, and not having been
recorded in 30 days, the payment of the money to the
bank in March, 1907, was within the statute. But it
will be observed that the legal title to the land was in
the bank. There was no title of record in Marshall to
the land. His only right was by virtue of the side
paper which he held to redeem the land from the bank.
The purpose of the statute in requiring the mortgage
to be recorded in 30 days is to give notice, but here
the record gave notice; for on the record there
was no title in Marshall. The transaction had by the
bank with Marshall in 1901 was simply a lending of
money upon the security of the land. It was not with-
in the statute. There was no purpose in that trans-
action to prefer the bank, and the bank had a lien on
the land, both for the money which it paid Mrs. Tay-
lor, and for the money which it advanced to Marshall.
The fact that the bank afterwards advanced $300 to
Marshall on the security which it held is immaterial.
The conveyance by Mrs. Taylor to the bank not being
within the purview of the first part of the statute, it is
entirely immaterial under the proviso of the statute
that it was not recorded within 30 days.

5. On October 25, 1906, Marshall borrowed of A. H.
Calvert $3,000 and to secure the debt executed simul-
taneously to Calvert a mortgage upon his horses and
hogs. The mortgage was not recorded until after
Marshall's death and is attacked because held unre-
corded for more than 30 days. The money was bor-

rowed and the mortgage executed simultaneously to secure the debt then created. It stands just as the mortgage upon the cattle to secure the debt for $3,000 to the Deposit Bank above referred to, and, for the reasons there given, cannot be assailed under the statute. The circuit court properly dismissed the plaintiff's petition as to all the matters above referred to.

6. W. W. Ball was cashier of the First National Bank of Maysville, and he was also the secretary of the Union Trust & Savings Company. He and Marshall were intimate friends and members of the same church. For years Ball had been lending Marshall money as cashier of the bank. About December 22, 1906, Marshall was in Maysville, and stayed all night with Ball, telling him then that he had concluded to consolidate his indebtedness and wanted to make a loan through Ball for a sum covering it. He told Ball what property he had, and that he had bought out one sister and still owed the other, Mrs. Ambler. At this time he was expecting to get a deed from Mrs. Ambler, and in order to do this would have to pay her $4,000. To get the title from the bank to which Mrs. Taylor had conveyed her interest he would have to pay that bank about $3,000. He explained to Ball how he wanted to perfect his title to the land and then give a mortgage on all the land for the amount of money that he needed and Ball was to get the money for him at 5 per cent., whereas he was then paying 6 per cent. They separated without anything definite being done; Ball telling him that it could be arranged. In January he saw Ball again and told him that he would need some money before he could get the Ambler title, something like $1,200 or $1,500. On January 4th, he and his wife executed to the Union Trust Company, of which Ball was the secretary, a mort-

gage for $15,000, and the Trust Company was not to have the mortgage recorded but wait until the title was perfected, and then have the mortgage for the larger sum which he wished recorded. The trust Company then paid him $10,000 with which he paid off the Deposit Bank of Pearce, Fant & Company on January 5th as above referred to. The Trust Company had a debt at the time of $2,000 which was deducted from the $15,000, and the remainder of the $15,000 was paid him in money. Before they had gotten a deed from Mrs. Ambler, she suddenly died and this delayed the preparation of the larger mortgage longer than was anticipated. After talking the matter over with Marshall, Ball agreed to let him have $40,000 on the land, and to pay him $36,000 of it and hold back $4,000 to pay the Ambler heirs. Some time in March and before the mortgage had been given, Ball lent Marshall $1,500 for the Trust Company without security, and he had previously lent him without security as cashier of the Maysville National Bank about $10,000. On May 6th the mortgage to the Union Trust & Savings Company for $40,000 was put to record and bonds for $40,000 were signed by Marshall. Four thousand dollars of the bonds were held by the Trust Company to pay the Ambler heirs. The remaining $36,000 was disposed of as follows:

| | |
|---|---|
| Union Trust & Savings Company | $16,822 50 |
| First National Bank of Maysville | 10,150 85 |
| Union Trust & Savings Company | 400 00 |
| W. F. Taylor | 2,043 00 |
| Martha Bramel | 1,585 00 |
| Mary R. Wells | 6,108 35 |
| Total | $37,109 70 |

The surplus above $36,000 was in part lent on that day to Marshall by Ball, and in part was paid by him

out of other funds which he had. When they had done this Logan Marshall, a cousin of R. T. Marshall, who was about to go to Texas, came to Marshall and said that he wanted $3,000 which he owed him. Marshall went to Ball saying that he had rather die than disappoint that boy and Ball then lent him $3,000, as cashier of the Maysville National Bank, taking as collateral security $4,000 of notes which Marshall held on others. R. T. Marshall paid the $3,000 to Logan Marshall. About the same time Marshall gave to James N. Kirk a check for $2,165 to pay a debt he owed him. Kirk did not present the check on that day, but it was, it seems, paid the day after Marshall died. Marshall was apparently in perfect health, but went home the night of May 6th, and died of apoplexy before morning. He had $35,000 of insurance on his life which was paid after his death; $20,000 of it being for the benefit of his wife, and $15,000 for the benefit of his estate. He had borrowed on the insurance policies up to their loan value, and when these loans were deducted from the face of the policies the net amount that remained was about $32,000. The policies had no cash value in his lifetime. By his will he directed his debts to be paid and devised his property, subject to his debts, to his wife, with minute directions as to the management of the estate. His wife renounced the will and this litigation followed.

The transaction of January 4th between Marshall and the Trust Company is not difficult to understand under the facts shown by the record. The clerk had seen the president of the bank about the recording of the mortgage, and the president had declined to consent that it should remain unrecorded, leaving

the responsibility on the clerk.  The clerk was unwilling to carry the responsibility, and it is evident from the circumstances that Marshall saw that this mortgage must be recorded or the $10,000 debt must be paid.  So he applied to his friend Ball to help him and Ball not only lent him the $10,000 to pay the bank, but also let him have $3,000 more which he then needed, taking a mortgage which was not recorded, for the reason that the parties soon expected the larger mortgage to be given and this amount to be then deducted.  The preparation of the larger mortgage was delayed by the unexpected death of Mrs. Ambler, but there was nothing in this transaction between Marshall and the Trust Company evidencing any intention on his part to prefer any of his creditors to others.  It was simply an effort of a struggling debtor to maintain his credit and so manage his property as to save himself from ruin.  It is said the Trust Company included a $2,000 debt it then had against Marshall in this mortgage.  This is true, but that this was not done to prefer the Trust Company and in contemplation of Marshall's insolvency is shown by the fact that after this the Trust Company lent him, without security, $1,500, and the National Bank of which Ball was cashier continued to carry about $10,000 of his paper without security.  We therefore conclude that the transaction of January 4th between Marshall and the Trust Company was not within the statute.

This brings us to the pivotal question in the case: Was the mortgage of May 4th or the payment of the money on May 6th which was obtained under the mortgage, within the statute?  The letters of Marshall, his will, and the other proof in the record leave no doubt in our minds that he did not in fact contem-

plate being insolvent, or in fact intend to prefer the creditors whom he paid off on May 6th to his other creditors, and if the case is to be determined on what he in fact intended, the mortgage should be sustained. On the other hand, the proof is equally clear that Marshall was in fact insolvent and that the necessary effect of this mortgage and the payment of the money on May 6th was to prefer these creditors to the others. He then owed $85,000. He had mortgaged his horses, his cattle, and his land ,and he had pledged the greater part of the notes which he held. When these transactions were concluded on May 6th, he had nothing which a creditor could reach for his debt. Practically everything that he had was mortgaged or pledged, and at least $40,000 of his debts were left unprovided for. Not only so, but in this arrangement he secured the First National Bank of Maysville and the Union Trust & Savings Company, both of whom were managed by Ball, and he paid off the debts of W. F. Taylor, Martha Bramel and Mary R. Wells, all of whom Ball represented in lending their money. Ball had made these loans to Marshall, and had looked after them from time to time. Ball was his particular friend, and so in this transaction he secured all the persons whom Ball represented, and left his other creditors unsecured. While the proof in the record is clear that Marshall valued his land at from $70,000 to $80,000, no witness who testified in the case values it so high. On the contrary, according to the uncontradicted testimony in the record, it was not worth at that time as much as it afterwards sold for, $47,000, and out of this his mother's right of dower and his wife's potential right of dower must be deducted. Deducting these, we have the value of his estate in land and visible property, not exceeding $50,000; and if

we put the notes which he held at $7,000 his whole estate amounted to at least $28,000 less than his debts. He was a careful business man and a man of intelligence. His will, no less than his declarations in the record, show that he knew what he owed. He knew the amount of his debts and he knew just what property he owned. If he had valued his land as its value is shown by all the proof in the record, he would have known that he was insolvent by $28,000.

We have steadily maintained under the statute that when an insolvent debtor makes a transfer to one of his creditors with a knowledge that he is insolvent, the design to prefer will be presumed, unless the circumstances attending the act repel the presumption that the debtor's design was to prefer one creditor to the exclusion of the others. Grimes v. Grimes, 86 Ky. 511, 6 S. W. 333, 9 Ky. Law Rep. 694; Baker v. Kinnaird, 94 Ky. 5, 21 S. W. 237, 14 Ky. Law Rep. 695; Northern Bank of Ky. v. Farmers' National Bank, 111 Ky. 350, 63 S. W. 604, 23 Ky. Law Rep. 696. The purpose of the statute is to secure equality between creditors, and to prevent the debtor from preferring one creditor to another. When a preference is in fact given, the debtor must be held to intend the natural consequences of his act. To say that he may fix an extravagant value upon his property and thus prevent the operation of the statute, by deceiving himself as to its value, would be to emasculate the statute. The law requires of men to exercise ordinary care; and when a failing debtor would shield himself from the statute by his estimate of the value of his property, it must appear that he had reasonable ground for the valuation. The law holds a man to know what a person of ordinary prudence, situated as he was, would know. The property of a failing debtor

must not be estimated at a fanciful price which he may set upon it, but upon its reasonable, fair value; and where he knows his property and knows his debts, he cannot be said not to contemplate the necessary effect · of his acts. When the transaction of May 6th was done, Marshall had secured his creditors who were represented by his friend, W. W. Ball, and he had practically left half his creditors unprovided for. To say that these transactions were not within the statute would be to destroy its usefulness, and to hold out a premium to debtors not to exercise ordinary care to learn whether or not they were insolvent in transactions of this sort. It would open a wide door by which preferences could be made and the manifest purpose of the statute would be defeated. We therefore conclude that the court properly held the mortgage of May 4th, and the payments on May 6th, within the statute. But the Union Trust & Savings Company is entitled to be paid out of the mortgage the $10,000 which it paid Marshall on January 4th to pay the Deposit Bank and the $3,000 which it then lent him. Its $2,000 debt was not paid until May 6th, and as to this debt the mortgage and payment were within the statute. But it furnished the $13,000 upon a lien given on the land and this lien was brought over into the mortgage and is valid. The court erred in not so adjudging. The court properly held the payment to Logan Marshall and James M. Kirk within the statute.

The pledging of the collateral notes to the National Bank of Maysville on May 6, 1907, was to secure a debt created on that day simultaneously with the pledge of the notes. This transaction was not within the statute. The circuit court erred in holding that it

was, and in requiring the National Bank to turn over to the receiver this collateral.

On the appeal of the Union Trust & Savings Company of Maysville, and the First National Bank of Maysville, the judgment appealed from is reversed as to them, and it is affirmed as to the other appellants. On the appeal of J. P. Taylor, etc., the judgment appealed from is affirmed.